**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DONNA S. PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 13-cv-00114** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Susan E. Cox** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## Order

For the reasons outlined in the attached Order, Ms. Parker's motion for summary judgment for reversal or remand [dkt. 17] is denied.

## Statement

Plaintiff, Donna S. Parker, seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for a period of disability and disability insurance benefits ("DIB") and for supplemental security income ("SSI") under the Social Security Act ("the Act"). Ms. Parker has filed a motion for summary judgment, seeking to reverse the Commissioner's final decision or remand the case for consideration of the issues raised herein. For the reasons set forth below, Ms. Parker's motion for summary judgment reversal or remand is denied [dkt. 17].

**I.      Procedural History**

Ms. Parker filed concurrent applications for a period of disability and DIB and for SSI on March 9, 2010, alleging that she became disabled on February 6, 2008.[1] Her claim was denied

---

[1] R. at 20.

initially on June 18, 2010, and again upon reconsideration on September 21, 2010.[2] On September

24, 2010, Ms. Parker submitted a written request for a hearing before an Administrative Law Judge

("ALJ").[3] A hearing presided over by ALJ Patricia A. Bucci was held on June 20, 2011 in

Chicago, Illinois.[4] Following the hearing, the ALJ issued a partially favorable decision on August

11, 2011, concluding that Ms. Parker has been disabled under sections 216(i), 223(d), and

11614(a)(3)(A) of the Act beginning on December 7, 2010.[5] The Appeals Council denied

Ms. Parker's request to review the ALJ's denial of DIB and SSI for the period between her alleged

disability onset date on February 6, 2008 and December 7, 2010, thus, the ALJ's decision stands as

the final decision of the Commissioner.[6] Ms. Parker filed the instant action on January 7, 2013.

## II.    Factual Background

The facts set forth under this section are derived from the administrative record. We begin

with an overview of Ms. Parker's background and relevant medical history. We then summarize

the testimony given at the ALJ hearing before finally examining the ALJ's decision. We focus

particularly on the period for which the ALJ denied DIB and SSI to Ms. Parker, between February

6, 2008 and December 7, 2010.

### A.    Ms. Parker's Background and Relevant Medical History

Ms. Parker was born December 8, 1960.[7] She was forty-nine years old when she applied

for DIB and SSI.[8] In her Adult Disability Report, Ms. Parker listed arthritis in her hands, legs and

knees, and degenerative joint disease in her knees as limiting her ability to work because she is in

---

[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] R. at 29-30.
[6] R. at 1-3.
[7] R. at 134.
[8] *Id.*

constant pain and cannot stand, walk or sit for very long.[9] She further noted that she has suffered from mild and intermittent asthma since 2005, although she has never been hospitalized because of it.[10] Ms. Parker is divorced with no minor children.[11] She stands 5'5" and weighs approximately 230 pounds, which corresponds to a body mass index (BMI) of 38.3 and a categorization of Level II obesity.[12] Ms. Parker claims that her knee pain stems from a slip and fall she suffered at work in January 2004.[13]

Because of her medical conditions, Ms. Parker stopped working on February 6, 2008, the alleged date of onset of her disability.[14] Ms. Parker partially completed the tenth grade but did not obtain her GED.[15] Her recent employment history includes working as a mail carrier for the U.S. Postal Service from October 1994 until November 2008.[16] Ms. Parker testified that her knee gave out in February 2008, which made her unable to complete her mail route.[17] She received workers' compensation benefits from February 2008 until October 2008.[18] Numerous healthcare professionals treated Ms. Parker during the relevant time period, therefore, our review will be configured according to her treatment providers.

### 1.    Harold Pye, M.D.

Ms. Parker was under the care of Harold Pye, M.D. from January 31, 2008 until October 31, 2008.[19] On February 7, 2008, Dr. Pye ordered a magnetic resonance imaging scan ("MRI") of

---

[9] R. at 165.
[10] R. at 297.
[11] R. at 135.
[12] R. at 23, 165.
[13] R. at 25.
[14] *Id.*
[15] R. at 46.
[16] R. at 184.
[17] R. at 46.
[18] R. at 43, 142, 226.
[19] R. at 238.

her right knee and an X-Ray of both of her knees.[20] The left-knee X-Ray indicated mild to moderate osteoarthritis,[21] which is the degeneration of joint cartilage and the underlying bone.[22] The right-knee MRI revealed moderate to severe osteoarthritis and two tears: a bucket-handle type tear of her medial meniscus (inner knee) and a likely chronic partial tear of her anterior cruciate ligament ("ACL").[23] Dr. Pye recommended physical therapy and referred Ms. Parker to J. Michael Morgenstern, M.D. for an orthopedic consultation.[24] Ms. Parker received three Synvisc Hylan injections in her right knee between June 2008 and August 2008.[25]

On June 20, 2008, Ms. Parker had both an MRI and an X-Ray performed on her lumbar spine for low back pain.[26] The tests revealed mild to moderate degenerative disc changes and mild lumbar spinal stenosis,[27] a narrowing of the lumbar spinal canal that puts pressure on the spinal cord or sciatic nerve roots.[28] Ms. Parker was referred for physical therapy and acupuncture therapy.[29] On October 8, 2008, eight months after her alleged onset date of disability, Dr. Pye released Ms. Parker to return to work the following day with "mainly sedentary duties."[30]

### 2. J. Michael Morgenstern, M.D.

Dr. Morgenstern saw Ms. Parker on February 22, 2008 for an orthopedic consultation.[31]

---

[20] R. at 235-37.
[21] R. at 236.
[22] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/musculoskeletal_and_connective_tissue_disorders/joint_disorders/osteoarthritis_oa.html?qt=osteoarthritis&alt=sh (2013).
[23] R. at 235-36.
[24] R. at 248.
[25] R. at 265, 267, 273.
[26] R. at 256, 258.
[27] Id.
[28] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/musculoskeletal_and_connective_tissue_disorders/neck_and_back_pain/lumbar_spinal_stenosis.html?qt=spinal%20stenosis&alt=sh (2013).
[29] R. at 254.
[30] R. at 238.
[31] R. at 349.

Dr. Morgenstern recommended a surgical arthroscopy, a common procedure involving viewing the joint with a small camera to diagnose and treat knee problems,[32] of Ms. Parker's right knee.[33] On March 6, 2008, Dr. Morgenstern performed an ACL repair surgery on Ms. Parker's right knee.[34] Ms. Parker continued to see Dr. Morgenstern for follow-up visits between March 2008 and August 2008.[35] During these visits Dr. Morgenstern recommended that Ms. Parker participate in right-knee physical therapy and use ice and anti-inflammatories to help with pain and swelling.[36]

### 3.  Provident and Stroger Hospitals

Ms. Parker received no medical treatment between October 2008 and January 2010. In early January 2010, Ms. Parker visited Provident Hospital of Cook County ("Provident") with complaints of a cold, coughing, and wheezing.[37] Ms. Parker did not complain of knee pain to Provident until early February 2010.[38]

On February 18, 2010, Matthew Sisk, M.D. of John H. Stroger Jr. Hospital of Cook County ("Stroger") attended to Ms. Parker.[39] Dr. Sisk ordered an X-Ray of her left knee, prescribed Ibuprofen and a cane, but ultimately discharged her only with instructions to follow up in one to two weeks.[40]

### 4.  Mahesh Shah, M.D.

On May 19, 2010, Mahesh Shah, M.D. completed a consultative examination for the

---

[32] U.S. National Library of Medicine, Medline Plus, *Knee Arthroscopy*, http://www.nlm.nih.gov/medlineplus/ency/article/002972.htm (2013).
[33] R. at 350.
[34] R. at 43, 171, 353, 355.
[35] R. at 351, 352, 353, 354.
[36] R. at 352-54.
[37] R. at 293-96.
[38] R. at 287-88.
[39] R. at 303.
[40] R. at 303-04, 305, 306.

Bureau of Disability Determination Services.[41] Dr. Shah noted that Ms. Parker had 100 degree flexion and full extension in both knees.[42] Dr. Shah further noted that Ms. Parker had tenderness surrounding both of her knees, she was able to bear her own weight and did not use any assisting devices for ambulation but her gait was slow, she was able to heel-walk and toe-walk with only some discomfort, and she was unable to squat down.[43] Dr. Shah found Ms. Parker's arthritis to be particularly worse in her left knee.[44]

### 5. Frank Jimenez, M.D.

Frank Jimenez, M.D., a state medical consultant, conducted a physical residual functional capacity ("RFC") assessment on June 9, 2010.[45] Dr. Jimenez determined that Ms. Parker could occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand or walk with normal breaks for at least two hours in a normal workday; sit with normal breaks for about six hours in a normal eight-hour workday; and perform unlimited pushing and pulling.[46] He further noted that Ms. Parker could only occasionally climb, balance, stoop, kneel, crouch, and crawl due to her arthritis.[47] Dr. Jimenez documented that Ms. Parker should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, due to her history of mild asthma.[48]

### 6. Virgilio Pilapil, M.D.

On September 17, 2010, Virgilio Pilapil, M.D., a state medical consultant, reconsidered Ms. Parker's initial RFC.[49] Dr. Pilapil concluded that because Ms. Parker alleged no worsening of

---

[41] R. at 297.
[42] R. at 299.
[43] R. at 299-300.
[44] R. at 300.
[45] R. at 307-14.
[46] R. at 308.
[47] R. at 309.
[48] R. at 311.
[49] R. at 324-26.

her conditions, claimed only allegations that were already included in the initial assessment, and showed no significant differences in findings from the original claim, the prior sedentary RFC decision should stand.[50]

### 7. Chantal Tinfang, M.D.

Ms. Parker first saw Provident physician Chantal Tinfang, M.D. in April 2010 for a check-up with complaints of bilateral knee and low back pain.[51] On July 7, 2010, Ms. Parker returned to see Dr. Tinfang for a follow-up visit, again complaining of bilateral knee pain.[52] An X-Ray revealed degenerative changes in Ms. Parker's right knee.[53] Dr. Tinfang recommended she begin physical therapy.[54]

On September 29, 2010, Dr. Tinfang completed an RFC questionnaire.[55] Dr. Tinfang's answers differed from Dr. Jimenez's and Dr. Pilapil's RFC assessments in that she could only continuously stand for fifteen minutes and continuously sit for only thirty to forty-five minutes, while alternately sitting/standing for no more than two hours in an eight-hour work day.[56] Dr. Tinfang's opinion differed further in that she found Ms. Parker could only lift and carry less than five pounds and that she was completely unable to squat or kneel.[57]

On January 31, 2011, Dr. Tinfang conducted her own RFC assessment of Ms. Parker.[58] Dr. Tinfang provided descriptions or explanations in the general questions section, but provided no medical findings other than the July 2010 X-Ray of her right knee, and provided no

---

[50] *Id.*
[51] R. at 316.
[52] R. at 319.
[53] R. at 321.
[54] R. at 320.
[55] R. at 328-31.
[56] R. at 329.
[57] R. at 330.
[58] R. at 333-45.

explanations as to how the X-Ray supported her assessment of Ms. Parker's physical limitations.[59]

## B. Testimony from the ALJ Hearing

Ms. Parker's hearing before the ALJ occurred on June 20, 2011 in Chicago, Illinois.[60] Ms. Parker appeared in person and was represented by her attorney, Deborah Spector.[61] In addition, vocational expert ("VE"), James Radke, after examining Ms. Parker's exhibits and vocational background, provided testimony regarding positions that would be available to Ms. Parker in consideration of her limitations.

### 1. Ms. Parker's Testimony

Ms. Parker testified that she stopped working as a mail carrier in February 2008 because her "knee gave out."[62] She stated that Dr. Pye had her off work from February 2008 until the end of October 2008.[63] Then, in October 2008, the Post Office terminated Ms. Parker's workers' compensation payments and gave her the option of termination or resignation.[64] Ms. Parker resigned in November 2008.[65]

Ms. Parker claimed that she attempted to find work but no one would hire her because she had a limp.[66] Consequently, she began living with her adult children.[67] She further claimed that she did not have any insurance following her resignation, and because she feared incurring expenses she could not pay, she suffered through the pain and relied on over-the-counter

---

[59] *Id.*
[60] R. at 20.
[61] R. at 39.
[62] R. at 46.
[63] R. at 47.
[64] *Id.*
[65] R. at 48.
[66] *Id.*
[67] R. at 49.

medication and limited activity instead of seeking treatment.[68]

Ms. Parker then testified that in either December 2009 or January 2010, she was informed that she could receive care at Provident.[69] Once at Provident, Ms. Parker received a limited medical card but was unable to receive specialty orthopedic care through Provident because there were no orthopedic surgeons available.[70] Ms. Parker further stated that her current physician, Dr. Tinfang, would not recommend physical therapy because she did not believe it would work.[71] Instead, Dr. Tinfang suggested that Ms. Parker use a cane for support.[72] Ms. Parker stated that although she might have felt more confident with a cane in 2008 and 2009, she did not use one then because no one suggested it and she "didn't want to feel like an old lady."[73] Finally, Ms. Parker relied on Dr. Morgenstern's alleged recommendation that she was too young for a knee replacement and that she should wait as long as possible to avoid having them replaced multiple times.[74]

Next, Ms. Parker testified that she is limited in her daily activities and spends most of her time at home with her children and grandchildren.[75] She stated, however, that she is unable to babysit her grandchildren because she cannot chase after or lift them.[76] She alternates between sitting, standing and lying down, and sometimes spends the entire day in bed two or three days a week.[77] Ms. Parker also stated that in 2008 and 2009 she was "a little better"; she would not stay in

---

[68] R. at 48.
[69] R. at 48-49.
[70] R. at 43.
[71] R. at 49.
[72] R. at 59.
[73] *Id.*
[74] R. at 50, 57.
[75] R. at 51.
[76] *Id.*
[77] R. at 54.

bed all the time, maybe only one day a week.[78]

Ms. Parker stated that it is difficult for her to prepare her own meals or help with house work, but she is sometimes able to vacuum the house one room at a time.[79] She stated that she is able to lift a gallon of milk, can only walk about as far as three houses without stopping, and can only stand for fifteen to twenty minutes at a time.[80]

### 2.    The VE's Testimony

The VE began by testifying that Ms. Parker would not be able to return to a position as a mail carrier with the Post Office.[81] Next, the ALJ inquired as to what jobs a hypothetical person with Ms. Parker's limitations would be able to perform.[82] The VE responded that there were unskilled and sedentary, general office clerk positions available to such a person, and that these positions would also allow the person to sit or stand at will.[83] When the ALJ asked the VE whether those jobs could be performed if the person were to require being off-task or lying down for fifteen percent of an eight-hour day, he replied that the jobs could not.[84]

### C.    The ALJ Decision

On August 11, 2011, the ALJ issued a partially favorable decision, concluding that Ms. Parker has been disabled under sections 216(i), 223(d), and 11614(a)(3)(A) of the Act since December 7, 2010, the date she turned fifty.[85] The ALJ denied Ms. Parker DIB and SSI for the

---

[78] *Id.*
[79] R. at 55.
[80] R. at 51.
[81] R. at 62.
[82] *Id.*
[83] R. at 62-63.
[84] *Id.*
[85] R. at 29-30.

period between her alleged disability onset date of February 6, 2008 and December 7, 2010.[86]

SSA regulations prescribe a sequential five-part test for ALJs to use in determining whether a claimant is disabled.[87] The ALJ must first consider whether the claimant is presently engaged in any substantial gainful activity which would preclude a disability finding.[88] Here, the ALJ found that Ms. Parker has not engaged in any substantial gainful activity since the alleged onset date of February 6, 2008.[89] The ALJ noted that although Ms. Parker had worked after the alleged disability onset date, records showed that she had made earnings far below the presumptive amount of substantial gainful activity.[90]

Next, the ALJ must consider whether the claimant has a severe impairment or combination of impairments.[91] In this case, the ALJ concluded that Ms. Parker had the following impairments: osteoarthritis of the knees, obesity, asthma, arthritis, and degenerative disc disease of the lumbar spine.[92] The ALJ noted that these impairments were "'severe' within the meaning of the Regulations because they cause significant limitations in the claimant's ability to perform basic work activities."[93]

The third step is for the ALJ to consider whether the claimant's impairments meet or equal any impairment listed in the regulations as being so severe as to preclude gainful activity.[94] In the present case, the ALJ determined that the medical evidence did not demonstrate that Ms. Parker's impairments, individually or in combination, rose to the level of severity required under the

---

[86] *Id.*
[87] 20 C.F.R. § 404.1520(a)(1).
[88] 20 C.F.R. § 404.1520(a)(4)(i).
[89] R. at 22.
[90] *Id.*
[91] 20 C.F.R. § 404.1520(a)(4)(ii).
[92] R. at 22.
[93] R. at 23.
[94] 20 C.F.R. § 404.1520(a)(4)(iii).

listing.[95]

In the event that none of the claimant's impairments meet the listing requirements, the ALJ proceeds to the fourth step of the test: whether the claimant has the RFC to perform the requirements of her past relevant work.[96] In the present case, the ALJ found that Ms. Parker had the RFC "to perform a range of sedentary work as defined in 20 C.F.R. [sections] 404.1567(a) and 416.967(a)."[97] Although the ALJ did not restrict Ms. Parker's RFC to the limited pushing and pulling of fifteen pounds provided for in Dr. Pye's release, the other restrictions were equal to or more restrictive than the initial RFC assessment.[98] Next, the ALJ held that there was no credible medical reason to further limit her RFC.[99] Finally, the ALJ concluded that the sedentary RFC was consistent with the evidence as a whole and that Ms. Parker's allegations of greater pain and restrictions were unsupported.[100]

In particular, the ALJ noted that Ms. Parker's longitudinal medical record did "not necessarily support her allegations of disabling pain as of her alleged onset date of disability."[101] Furthermore, the ALJ acknowledged Dr. Pye's release to return to work in October 2008—eight months after her alleged onset date of disability.[102] Additionally, the ALJ held that Ms. Parker's explanation for her gap in treatment from August 2008 until January 2010, "[did] not ring true" because had Ms. Parker's pain been "so severe that she could not do 'anything' as testified, she would have sought some kind of care."[103] The ALJ cited to Ms. Parker's ability to care for her

---

[95] R. at 23-24.
[96] 20 C.F.R. § 404.1520(a)(4)(iv).
[97] R. at 24.
[98] R. at 24, 238, 308-09, 311.
[99] R. at 26.
[100] R. at 26, 27.
[101] R. at 25.
[102] *Id.*
[103] *Id.*

grandchildren at home.[104]

Turning to the opinion evidence, the ALJ did not explain what weight she gave to the opinion of Dr. Tinfang but decided that Dr. Tinfang's limitations were too restrictive based on the whole of the medical evidence.[105] Further, the ALJ noted that Dr. Tinfang did not conduct a function-by-function analysis, nor did she provide an explanation of the restrictions.[106] But the ALJ gave the opinion of Dr. Pilapil, the state's medical consultant who reviewed and affirmed the initial state RFC, great weight because his opinion that the medical evidence supported a sedentary RFC was consistent with the medical evidence as a whole.[107]

Ultimately, the ALJ found that Ms. Parker was not capable of performing any past relevant work.[108] The ALJ compared Ms. Parker's RFC with the physical and mental demands of her past work as a mail carrier and determined that the past work required exertion in excess of her RFC.[109]

The ALJ then proceeded to the fifth step: whether the claimant could successfully adjust to any other work after consideration of her RFC, age, education, and work experience.[110] If the claimant is able to do other work, then she is not disabled.[111] Here, the ALJ found that prior to December 7, 2010, in consideration of Ms. Parker's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Ms. Parker could have performed and, therefore, she was not disabled prior to December 7, 2010.[112]

## III.    Standard of Review

---

[104] *Id.*
[105] R. at 27.
[106] *Id.*
[107] *Id.*
[108] *Id.*
[109] *Id.*
[110] 20 C.F.R. § 404.1520(g).
[111] *Id.*
[112] R. at 28, 29.

The Court must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[113] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[114] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[115] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the Court.[116] Although the ALJ need not address every piece of evidence or testimony presented, she must adequately discuss the issues and build a logical bridge from the evidence to her conclusions.[117] The Court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or if the Commissioner applied an erroneous legal standard.[118]

## IV.    Analysis

Ms. Parker argues that the Court should reverse and remand the decision of the ALJ because the ALJ failed to: (1) properly evaluate the credibility of Ms. Parker's allegations and (2) give proper weight to the opinion evidence of Ms. Parker's treating physician. We find no error on the part of the ALJ with respect to either of these arguments. Overall, we determine that the ALJ constructed a logical bridge from the record to her conclusions and that she provided adequate support for her arguments.

### A.    The ALJ's Credibility Determination

---

[113] 42 U.S.C. § 405(g).
[114] *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009)).
[115] *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[116] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (citation omitted).
[117] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).
[118] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

First, Ms. Parker contends that the ALJ erred by improperly: (1) suggesting that she had a history of conservative treatment; (2) emphasizing the gap in her treatment history; (3) characterizing her daily living activities as being able to care for her grandchildren when she testified she could not; and (4) relying on Dr. Pye's release for Ms. Parker to return to work.

An ALJ's credibility determination cannot be invalidated unless it is "patently wrong" because the "ALJ is in the best position to determine a witness's truthfulness and forthrightness."[119] In determining whether a credibility determination is "patently wrong," a court examines whether the ALJ's determination was reasoned and supported.[120] The Seventh Circuit has explained that an ALJ needs only "'minimally articulate his or her justification for rejecting or accepting specific evidence of disability.'"[121] Moreover, "[i]t is only when the ALJ's determination lacks any explanation or support that [a court] will declare it to be patently wrong."[122]

### 1.    History of Conservative Treatment

Ms. Parker argues that the ALJ erred in making her credibility determination by finding that she has had only conservative treatment for her knees and back.[123] Although an ALJ should "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to

---

[119] *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002).

[120] *See Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003).

[121] *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

[122] *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (internal quotation marks and citation omitted).

[123] R. at 25-26.

seek medical treatment,"[124] it appears the ALJ considered Ms. Parker's explanations and the record as a whole in her analysis.

The ALJ need only "*consider* the entire case record and give specific reasons for the weight given to the individual's statements."[125] The ALJ specifically mentioned that Ms. Parker's longitudinal medical record did "not necessarily support her allegations of disabling pain as of her alleged onset date of disability."[126] The ALJ noted that Ms. Parker had only conservative treatment between the time of her initial injury in 2004 and her alleged onset date of February 6, 2008.[127] The record shows Ms. Parker's treatment within this period consisted of physical therapy, several cortisone injections, and five Synvisc injections.[128] The ALJ highlighted Ms. Parker's treatment by Dr. Pye and Dr. Morgenstern, including an MRI of her right knee and the subsequent surgical repair of her ACL accompanied by physical therapy and Synvisc injections.[129] The ALJ also noted that the record revealed that Ms. Parker had received and followed all of the recommended treatments prescribed by her various treating physicians, and that these treatments had been "generally successful."[130] Finally, the ALJ noted that in August 2008, Ms. Parker complained of only intermittent pain and swelling, and that she had been released by Dr. Pye in October 2008 to return to work eight months after her alleged onset date of disability.[131]

Nevertheless, Ms. Parker argues that when she had access to healthcare and insurance, she received extensive treatment for her back and left knee when they began to distress her in July

---

[124] S.S.R. 96-7p.
[125] *Id.* (emphasis added); *see also Terry*, 580 F.3d at 477.
[126] R. at 25.
[127] *Id.*
[128] R. at 281.
[129] R. at 25.
[130] R. at 26.
[131] R. at 25.

2008.[132] First, with respect to her back, Ms. Parker points to physical therapy, acupuncture, and pain killer treatment that she sought in July 2008 to support her claim of extensive treatment.[133] But Ms. Parker only went for acupuncture therapy once because her treating physician at the time did not recommend that she keep going.[134] Second, with regards to Ms. Parker's left knee pain, the record does not reveal physical therapy for bilateral knee osteoarthritis in July 2008.[135] Rather, during that time period, Ms. Parker received physical therapy on her right knee in relation to her ACL surgery from March 2008. The only medical record in 2008 that refers to Ms. Parker's left knee is the X-Ray Dr. Pye ordered in February 2008, after which Dr. Pye only prescribed physical therapy treatment for her right knee.[136] Ms. Parker did not again complain of left knee pain until February 2010 at Stroger, at which time Dr. Sisk prescribed Ibuprofen and a cane.[137]

Ms. Parker cites *Carradine v. Barnhart*[138] to support her claim that she pursued multiple methods of treatment, none of which resolved her pain.[139] In *Carradine*, the Seventh Circuit held that it was improbable that the claimant would have undergone treatment procedures that "included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits."[140] But unlike the plaintiff in *Carradine*, Ms. Parker was not

---

[132] Pl.'s Reply Brief at 2.
[133] *Id*.
[134] R. at 50, 254.
[135] Ms. Parker cites to the record at 279, but that refers to a billing from a visit to Dr. Pye in February 2008.
[136] R. at 248.
[137] R. at 303-06.
[138] 360 F.3d 751 (7th Cir. 2004).
[139] Pl.'s Reply Brief at 8.
[140] *Carradine*, 360 F.3d at 755.

prescribed heavy doses of strong drugs.[141] In fact, following her ACL repair surgery in March 2008, Ms. Parker's treatment consisted only of physical therapy, Synvisc injections, ice and anti-inflammatories.[142] Then, in August 2008, she complained of only intermittent pain and swelling and was released to return to work two months later.[143]

Ms. Parker further argues that "[r]egardless of how conservative [her] treatment modalities [were], they have been unsuccessful and [she] pursued multiple modalities while she had access to healthcare . . . ."[144] Ms. Parker cites Social Security Ruling 96-7p, which details that,

> [p]ersistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.[145]

Ms. Parker also argues that she made "repeated and persistent attempts to pursue treatment for her predominant disabling right knee injury[.]"[146] But Ms. Parker's treatment through Dr. Pye and Dr. Morgenstern in 2008 was predominantly for follow-ups regarding her ACL repair surgery, and only minimally concerned her complaint of back pain, as discussed above.[147] Following this treatment, Dr. Morgenstern noted in August 2008 that Ms. Parker complained of only intermittent pain and swelling and Dr. Pye concluded in October 2008 that Ms. Parker could return to work.[148] Moreover, Ms. Parker heavily relies on her treatment at Provident in January 2010 when she

---

[141] *Id.*; R. at 238.
[142] R. at 43, 171, 248, 265, 267, 273, 352-55.
[143] R. at 238, 352-54.
[144] Pl.'s Brief at 8.
[145] S.S.R. 96-7p.
[146] Pl.'s Reply Brief at 2.
[147] R. at 349-56.
[148] R. at 238, 354.

regained access to healthcare.[149] But she first visited Provident with complaints of a persistent cough and did not complain of knee pain until a month later.[150]

The Commissioner further argues that there is no medical evidence to support Ms. Parker's allegation that she is a candidate for knee replacement surgery but unable to receive it due to her age. Although this is true, Ms. Parker correctly contends that the Commissioner's argument violates the *Chenery* doctrine[151] "because the ALJ never addressed [the] issue or made such a finding."[152] Indeed, recent Seventh Circuit case law makes clear that "the Commissioner cannot defend the ALJ's decision . . . [when] the ALJ did not employ the rationale in his opinion."[153]

## 2. Gap in Treatment History

Ms. Parker next argues that although the ALJ considered Ms. Parker's explanation for the gap in treatment from August 2008 until January 2010, the ALJ held the gap in treatment against her. The Seventh Circuit has held that "[a]n ALJ may need to 'question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in consistent manner."[154] A "good reason" may include an inability to afford treatment.[155]

In reviewing the hearing transcript, we note that the ALJ inquired into whether Ms. Parker could explain her gap in treatment from August 2008 until January 2010. The ALJ learned that Ms.

---

[149] Pl.'s Brief at 9.

[150] R. at 287-88, 293-96.

[151] *See S.E.C. v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (holding that agency lawyers are barred from defending agency decisions on grounds that the agency itself did not embrace).

[152] Pl.'s Reply Brief at 2 n. 1.

[153] *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (citing *Chenery*, 318 U.S. at 87-88); *see also Robben-Cyl v. Colvin*, No. 11-C-7501, 2013 WL 1087556, at *2-3 (N.D. Ill. Mar. 14, 2013).

[154] *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (quoting S.S.R. 96-7p); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (emphasizing that "the ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care").

[155] S.S.R. 96-7p; *Shauger*, 675 F.3d at 696.

Parker had no medical insurance from the end of 2008 all through 2009, until she found out in early 2010 that she could visit Provident for free care.[156] The ALJ further learned that Ms. Parker was unable to obtain employment after she resigned her position as a mail carrier and was therefore not earning income.[157]

In *Eskew v. Astrue*, the Seventh Circuit held that the ALJ failed to build a "logical bridge" between the record and his credibility determination when he "failed to address [the claimant's] explanation that the gaps in treatment stemmed from her difficulty finding medical providers who accepted Medicare" and dismissed her explanation for not taking prescribed medication because, even though she was unemployed, she still purchased cigarettes during that time.[158] The ALJ here, however, addressed Ms. Parker's explanations and found that they "[did] not ring true" because had her pain been "so severe that she could not do 'anything' as testified, she would have sought some kind of care."[159] Ms. Parker concedes that the ALJ's assertion "arguably counts as 'considering' [Ms.] Parker's explanation as required by the Commissioner's rulings," but argues that the "cursory dismissal was insufficient in light of the fact that her finding was in direct conflict with the Commissioner's own rulings."[160] Nevertheless, Ms. Parker cites no case law in support of her argument that the ALJ's assertion was insufficient and contradictory to "the Commissioner's long-standing, published policy."[161]

### 3. Daily Living Activities

Ms. Parker also argues that the ALJ mischaracterized the record when she cited

---

[156] R. at 43, 48.
[157] R. at 48.
[158] 462 F. App'x 613, 616 (7th Cir. 2011).
[159] R. at 25.
[160] Pl.'s Reply Brief at 3.
[161] Pl.'s Brief at 10.

Ms. Parker's ability to care for her grandchildren at home.[162] Further, Ms. Parker contends that the ALJ failed to identify or discuss any of Ms. Parker's other activities of daily living.

An ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by objective medical evidence.[163] Indeed, the ALJ "need not totally accept or totally reject the individual's statements. . . . [But] may find all, only some, or none of an individual's allegations to be credible . . . [or only] credible to a certain degree."[164] And though "an ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability,"[165] an ALJ is not required to address every piece of evidence in her determination.[166]

In this case, the only daily activity the ALJ cited was Ms. Parker's apparent ability "to care for her grandchildren at home, which can be quite demanding both physically and emotionally."[167] But Ms. Parker actually testified that she was "around" her grandchildren at home but did not babysit them because she was unable to.[168] Therefore, the ALJ did, in fact, mistakenly mischaracterize Ms. Parker's daily activities to include the ability to care for her grandchildren. But such an error does not "necessarily mean the ALJ's credibility determination was patently wrong."[169] An ALJ's opinion must be read as a whole, and so long as a mistake "does not

---

[162] *Id.*

[163] S.S.R. 96-7p.

[164] S.S.R. 96-7p.

[165] *Clifford*, 227 F.3d at 870 (internal quotation marks and citation omitted).

[166] *McKinzey*, 641 F.3d at 891 ("[g]enerally speaking, an ALJ's adequate discussion of the issues need not contain a complete written evaluation of every piece of evidence.") (internal quotation marks and citation omitted); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (holding that an ALJ must "consider all relevant medical evidence . . . "[b]ut an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion") (citations omitted); *Craft*, 539 F.3d at 673 ("[t]he ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled . . . .") (citation omitted).

[167] R. at 26.

[168] R. at 26, 51.

[169] *See Jones*, 623 F.3d at 1161 (holding that even where the ALJ made a mistake in determining that there

undermine the substantial evidence that supports her credibility determination," the decision will not be "patently wrong."[170]

And although the Seventh Circuit has held that limited daily activities consisting of housework, shopping, driving short distances, walking her dogs, and playing did "not contradict a claim of disabling pain,"[171] the court subsequently held that where a claimant testified that her daily activities had changed within the alleged period of disability due to an exacerbation, the ALJ could reasonably find that the claimant's testimony undermined her complaints.[172] In this case, Ms. Parker testified that during the relevant time period, 2008 and 2009, she was "a little better" and did not stay in bed all the time.[173] Additionally, the Seventh Circuit has held that even where "the ALJ [does] not explicitly mention each activity," her analysis is not fatally flawed.[174] Indeed, it is well-settled that "an ALJ's 'adequate discussion' of the issues need not contain a 'complete written evaluation of every piece of evidence.'"[175] Even if the ALJ's credibility analysis was not necessarily "ideal," it is not "patently wrong" if "[t]he ALJ did not place undue weight on [the claimant's] activities of daily living . . . [but] specified several valid reasons for finding [the claimant] not credible."[176]

Here, the ALJ considered Ms. Parker's testimony of "described daily activities" generally and determined that they were "not limited to the extent one would expect, given [her] complaints

---

was a gap in the claimant's treatment, the "error [did] not necessarily mean the ALJ's credibility determination was patently wrong").
[170] *Id.*
[171] *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) (citation omitted); *Clifford*, 227 F.3d at 872.
[172] *Milliken v. Astrue*, 397 F. App'x 218, 225 (7th Cir. 2010).
[173] R. at 54.
[174] *Milliken*, 397 F. App'x at 225.
[175] *McKinzey*, 641 F.3d at 891.
[176] *See Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013) (citations omitted).

of disabling symptoms and limitations."[177] Ms. Parker testified that she has to alternate between sitting, standing and lying down and that she sometimes spends a whole day in bed two or three times a week.[178] Ms. Parker further stated that it is difficult for her to prepare her own meals or help with house work, but she is sometimes able to vacuum the house one room at a time.[179] She testified that she is able to lift a gallon of milk, can only walk about as far as three houses without stopping, and can only stand for fifteen to twenty minutes at a time.[180] In light of the foregoing record evidence, we conclude that the mischaracterization that Ms. Parker cared for her grandchildren did not undermine the substantial supporting evidence of the ALJ's credibility determination. The ALJ specified several valid reasons for finding Ms. Parker not credible, including Dr. Pye's release to return to work, the lack of medical evidence to support her complaints of back pain, a general lack of a longitudinal medical record to support her allegations of pain as of the alleged onset date of disability and her explanation for the gap in treatment.[181] Given the deferential nature of our review, we will not remand the ALJ's decision.[182]

### 4.      Reliance on Dr. Pye's Release to Return to Work

First, the Court notes Ms. Parker's lack of any legal support for her argument that the ALJ's failure to acknowledge that Dr. Pye released Ms. Parker to a restricted range of sedentary work resulted in an error by not including vocational evidence that Ms. Parker is capable of competitive work consistent with Dr. Pye's restrictions. Our review finds that, indeed, the ALJ recognized Dr. Pye's release of Ms. Parker to a restricted range of sedentary work when she found

---

[177] R. at 26.
[178] R. at 54.
[179] R. at 55.
[180] R. at 51.
[181] *See Schreiber*, 519 F. App'x at 961 (holding that an ALJ's credibility analysis was not "patently wrong" where the ALJ "specified several valid reasons for finding [the claimant] not credible" and "did not place undue weight on [the claimant's] activities of daily living . . . ."); R. at 25.
[182] *See id.*

that:

> [T]he claimant can occasionally lift and/or carry up to [ten] pounds occasionally and frequently, stand and/or walk for a total of at least [two] hours in an [eight]-hour workday, sit for a total of about [six] hours in an [eight]-hour workday and engage in unlimited pushing and/or pulling. The claimant: can only occasionally climb, balance, stoop, kneel, crouch or crawl. The claimant should also avoid concentrated exposure to fumes, odors, dusts, gasses and poor ventilation.[183]

Although the ALJ did not limit Ms. Parker's RFC to the exact restrictions of Dr. Pye's release, despite these differences, the ALJ's findings were more restrictive than Dr. Pye's because: (1) the ALJ limited Ms. Parker's RFC to lifting and carrying only ten pounds, whereas Dr. Pye only limited her to fifteen pounds for these activities; and (2) the ALJ limited Ms. Parker's RFC to standing or walking for a total of two hours and sitting for only six hours within a normal workday, while Dr. Pye's sole restriction was that Ms. Parker should not stand or walk for more than an hour without a twenty-minute rest break.[184] And even if the ALJ had exactly copied Dr. Pye's restrictions from his release, the fact remains that he released her to return to work eight months after her alleged disability onset date in February 2008. Accordingly, the Court finds that the ALJ built an accurate and logical bridge between the evidence and her conclusion.[185]

### B.     The ALJ Reasonably Rejected the Opinion Evidence of Dr. Tinfang

Ms. Parker contends that the ALJ failed in her analysis when she stated that (1) based on Dr. Tinfang's opinion, Ms. Parker should be bedridden or confined to a wheelchair, (2) Dr. Tinfang provided no function-by-function analysis and no explanation for Ms. Parker's physical limitations, (3) Dr. Tinfang's opinions were vague and not supported by the evidence, and

---

[183] R. at 24.
[184] R. at 24, 238.
[185] *See Jones*, 623 F.3d at 1160 ("The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions.").

(4) there was the possibility that Dr. Tinfang simply wanted to assist Ms. Parker because she sympathized with her.[186]

Generally, a claimant's treating physician will only be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and "not inconsistent with the other substantial evidence in the medical record."[187] "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."[188] The weight an ALJ allocates to a treating physician's opinion depends on a number of factors, including (1) "the length, nature, and extent" of the treatment relationship; (2) "whether the physician supported his or her opinions with sufficient explanations"; (3) "whether the physician specializes in the medical conditions at issue"; and (4) the consistency of the physician's "opinion [] with the record as a whole."[189]

## 1.    Length, Nature, and Extent of the Treatment Relationship

Ms. Parker argues that there was no indication of a sympathetic relationship between Dr. Tinfang and Ms. Parker. But Ms. Parker fails to cite any case law and simply argues that the ALJ failed in her analysis. The Seventh Circuit has recognized that it "is well known [that] many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits."[190] Ms. Parker did not begin seeing Dr. Tinfang until April 2010, which was only a month after she filed her

---

[186] R. at 27.

[187] 20 C.F.R. § 404.1527(c); S.S.R. 96-5p; *Hofslien v. Barnhart,* 439 F.3d 375, 376 (7th Cir. 2006) (finding that the treating physician's evidence is no longer entitled to controlling weight once well-supported contradicting evidence is introduced).

[188] *Clifford,* 227 F.3d at 870; *Rohan v. Chater,* 98 F.3d 966, 968 (7th Cir. 1996) ("as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.")

[189] *Elder,* 529 F.3d at 415 (citing 20 C.F.R. § 404.1527(c)(2), (3), and (5); *Hofslien,* 429 F.3d at 377; 20 C.F.R. § 404.1527(c)(4).

[190] *Hofslien,* 439 F.3d at 377 (citations omitted).

application for DIB and SSI.[191] This fact, combined with the extensive restrictions of Dr. Tinfang's assessments detailed above, supports the ALJ's reasonable reliance on this factor.[192]

### 2. Support and Explanations for Dr. Tinfang's Opinion

Dr. Tinfang completed a function-by-function analysis, however, as the ALJ pointed out, she did not provide explanations for her restrictions as required.[193] Social Security Ruling 96-9p provides that an "RFC assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment."[194] The ALJ further noted that Dr. Tinfang's opinions were unsupported by the evidence.[195] Dr. Tinfang did not attach medical findings other than Ms. Parker's July 2010 X-Ray of her right knee, and provided no further explanation as to how the X-Ray supported her assessment of Ms. Parker's limitations.[196] Indeed, Ms. Parker concedes that the required medical records are "scant," and that Dr. Tinfang's opinion regarding Ms. Parker's manipulative and environment limitations is "arguably unsupported."[197]

### 3. Dr. Tinfang's Specialty

The ALJ noted that Dr. Tinfang is not an orthopedic specialist.[198] A treating physician's opinion will be given more weight when she specializes in the medical conditions at issue.[199] Ms. Parker argues, however, that Dr. Pilapil is also not an orthopedic specialist yet the ALJ gave

---

[191] R. at 316.
[192] *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008) (quoting *Rice,* 384 F.3d at 372)(noting that if the ALJ "minimally articulates" her reasons for rejecting the treating physician's opinion, her decision must stand); *see also* 20 C.F.R. § 404.1527(c)(2) ("[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *Elder,* 529 F.3d at 415.
[193] R. at 27.
[194] S.S.R. 96-9p.
[195] R. at 27; *see also Skarbek,* 390 F.3d at 503 (rejecting a treating physician's opinion that "was not well-supported by medical evidence").
[196] R. at 333-45.
[197] Pl.'s Reply Brief at 4.
[198] R. at 27.
[199] 20 C.F.R. § 404.1527(c)(5).

his opinion great weight. Though Dr. Pilapil does not specialize in orthopedic conditions, "[i]t is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation."[200] Accordingly, the ALJ's consideration of, and reliance on, this factor was reasonable.

### 4.    Consistency of Dr. Tinfang's Opinion with the Record

The ALJ found that Dr. Tinfang's opinion was unpersuasive because "the limitations [were] too restrictive based on the medical evidence as a whole."[201] For example, the ALJ noted that in a questionnaire on physical impairments completed in September 2010, Dr. Tinfang opined that Ms. Parker "could sit or stand for no more than two hours in and [sic] eight-hour work day, she could continuously stand for [fifteen] minutes at the most, and continuously sit for thirty minutes, and could walk for less than one half a block without stopping."[202] Further, the ALJ highlighted that in an RFC questionnaire completed in January 2011, Dr. Tinfang opined that Ms. Parker's "pain would constantly interfere with her ability to maintain the concentration and attention needed to perform even simple work tasks because she had osteoarthritis in both knees causing constant knee pain."[203] The ALJ reasoned that Ms. Parker "would be in a wheelchair or bedridden if she were as limited as Dr. Tinfang opined."[204] Although Ms. Parker testified that on some days she did remain in bed all day, Ms. Parker also testified that during 2008 and 2009, the relevant period for our consideration, she was "a little better," and would remain in bed only one day a week.[205] Furthermore, Ms. Parker stated that while she might have felt more confident with a cane

---

[200] *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.927(e)(2)(i)).
[201] R. at 27.
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] R. at 54.

during that time period, she did not use one because she "didn't want to feel like an old lady."[206] Discounting Dr. Tinfang's extreme assessment of Ms. Parker, therefore, does not rise to the level of reversible error because his findings were not supported by the record as a whole.

## V.    Conclusion

For the reasons outlined, Ms. Parker's motion for summary judgment for reversal or remand [dkt. 17] is denied.


**IT IS SO ORDERED.**

**ENTERED:**  May 12, 2014                    _____/s/ Susan E. Cox_____
                                             **UNITED STATES MAGISTRATE JUDGE**
                                             **Susan E. Cox**

---

[206] R. at 59.